UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| CHARLIE CRAIG HOUNIHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-00010-AGF |
| | ) | |
| THE PROCTOR & GAMBLE DISABILITY | ) | |
| COMMITTEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This is an action under Section 502(a)(1)(B) of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for disability benefits under an

employer sponsored disability benefit plan, and for breach of fiduciary duty pursuant to

Section 502(a)(3), 29 U.S.C. § 1132(a)(3). This matter is before the Court on the cross

motions for summary judgment filed by Plaintiff Charlie Craig Hounihan (ECF No. 32)

and by Defendants The Proctor & Gamble Disability Committee and The Proctor &

Gamble Company (collectively, "P&G") (ECF No. 39).[1] For the reasons set forth below,

P&G's motion for summary judgment will be granted, and Plaintiff's motion for

summary judgment will be denied.

## <u>BACKGROUND</u>

This case arises out of the denial of long-term disability benefits. The following

facts are undisputed. Plaintiff was employed by P&G as a technician on the Bounty

---

[1] The case was not scheduled for trial, based on the parties' expectation that it
would be resolved on cross motions for summary judgment. ECF No. 10.

paper towel line at the P&G Cape Girardeau, Missouri plant. P&G provides disability benefits through a self-funded ERISA plan, and Plaintiff was enrolled in the P&G U.S. Short-Term Disability Plan ("STD Plan") and the P&G Long-Term Disability Plan ("LTD Plan") (collectively, "the Plan"). Local Review Boards have authority and responsibility to review and decide initial benefit claims under the Plan, as well as to decide whether participants continue to be entitled to disability income benefits under the Plan. Nurse case managers review claims for disability income benefits under the Plan and make recommendation regarding whether a claimant is entitled to benefits.

The Disability Committee is the Plan's named fiduciary and is responsible for reviewing and making all final appeal decisions concerning benefit claims under the Plan. The Plan may require a participant to undergo an independent medical examination ("IME") or a functional capacity evaluation ("FCE") to determine whether a participant is or continues to be disabled and entitled to disability income benefits under the Plan.

The Plan provides that it is the participant's burden to establish whether he or she is disabled. "Partial disability" and "total disability" must be based on objective medical evidence. Disability income benefits will not be paid to a participant for any period during which the participant fails to provide satisfactory proof that the participant is and continues to be disabled.

The Plan defines "Total Disability" as follows:

"Total Disability" means a mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession and for which the participant is receiving regular recognizable treatment by a qualified medical professional. Usually, total disability involves a condition of such severity as to require care in a

hospital or restriction to the immediate confines of the home.

ECF No. 30-7 at 15. The Plan defines "Partial Disability" as follows:

> "Partial Disability" means a mental or physical condition resulting from an illness or injury because of which the participant is receiving medical treatment and cannot perform the regular duties of his or her job, but can perform other roles at the same site or other jobs outside the Company. Thus, a partially disabled participant is not necessarily prevented from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

*Id.* If a participant is partially disabled based on objective medical evidence, the participant may receive disability income benefits for a maximum of 52 weeks during his or her entire participation in the Plan.

In the fall of 2012, Plaintiff began experiencing severe pain in his hip and knee. Plaintiff's primary care physician, Robert Tipton, M.D., ordered diagnostic testing and indicated that Plaintiff could not return to work. Plaintiff began receiving total disability benefits under the Plan, effective September 19, 2012.

Jimmy Bowen, M.D., treated Plaintiff and began a course of pain management for pain radiating in Plaintiff's right hip, buttocks, and lower back. On January 10, 2013, Dr. Bowen released Plaintiff to return to work with the restrictions of light work. On February 11, 2013, the Cape Girardeau Reviewing Board ("Reviewing Board") notified Plaintiff that he would begin receiving payments under the Plan as partially disabled, effective January 10, 2013, because Plaintiff's department did not have work available that could accommodate his restrictions. Later, Plaintiff was determined to be totally

disabled under the Plan, effective February 5, 2013.[2]

On May 9, 2013, David King, M.D., an orthopedic surgeon, diagnosed Plaintiff with a femoral acetabular impingement and labral tear with parent label cyst. On June 10, 2013, Plaintiff underwent a right hip arthroscopic femoroplasty and acetabulosplasty for impingement with labral tear repair. He was re-admitted to the hospital on June 22, 2013, due to an infected right hip. Thereafter, Kurt Merkel, M.D., performed an emergency irrigation and debridement of the right hip to treat the infection.

Following surgery, Plaintiff continued to experience pain in his right hip. He underwent aspirations of the right hip and several irrigation and debridement procedures. In April 2015, Plaintiff had total hip replacement surgery and began treating with Christopher Mudd, M.D., an infectious disease specialist. Dr. Mudd opined that the infection from the original hip surgery was never fully cleared and that Plaintiff's hip implant should be removed. Thus, on May 6, 2015, Plaintiff's hip replacement was removed, and he underwent an irrigation and debridement procedure. On December 11, 2015, Plaintiff underwent his last total right hip replacement surgery. Overall, Plaintiff endured 17 surgical procedures on his hip, including several irrigation and debridement procedures, between 2013 and 2016.

On June 21, 2016, a progress note from Dr. Merkel indicated that Plaintiff, six months after his most recent hip replacement surgery, "seem[ed] to be getting along

---

[2] The parties did not identify, nor could the Court find, correspondence from P&G reflecting this change in disability status. However, the fact that Plaintiff began receiving benefits as totally disabled on February 5, 2013, is undisputed. Plaintiff does not challenge his disability status between January 10, 2013 and February 5, 2013.

well." ECF No. 18-1 at 145. Dr. Merkel noted that Plaintiff reported no significant pain, but that stiffness in the hip limited his motion and caused discomfort. Dr. Merkel opined that, overall, Plaintiff "seems to be doing well." *Id.*

On July 29, 2016, a nurse case manager requested that Plaintiff submit to an IME based on Dr. Merkel's progress note. On September 6, 2016, Matthew W. Karshner, M.D., performed an IME of Plaintiff. Dr. Karshner's IME report states that Plaintiff went on leave in September 2012 and had not returned to work; lived at home; and was able to drive, get groceries, carry grocery bags, run errands, pick up light items, don socks, and walk up fifteen steps at a time. Dr. Karshner details Plaintiff's medical history and noted that Plaintiff walks with a limp favoring the right side, although the limp was slight in nature. He concluded that Plaintiff was not totally disabled, but rather partially disabled as of June 21, 2016, the date of his last visit with Dr. Merkel. Dr. Karshner based his conclusion on Plaintiff's medical records and a physical examination, which indicated mild impairments. Dr. Karshner also concluded the following:

> The following restrictions are permanent given the hip joint replacement. Mr. Hounihan is limited to a 25 pound lift from floor to waist occasionally, 50 pounds waist to shoulder occasionally, 50 pounds above the shoulder, occasionally. He is able to carry 30 pounds for up to 200 feet occasionally. His trunk is not to bend below the waist as he only flexes 88 degrees at the right hip. He can bend occasionally to the waist, however. Squatting can be achieved half the distance, again due to limitations in hip flexion. He has no limitations for ambulation. He should be able to ascend and descend 1 flight of 15 steps at least twice an hour, but is not to climb ladders. There are no limitations for sitting, and no limitations regarding hearing or vision.

ECF No. 18-1 at 165. Dr. Karshner then recommended that Plaintiff be placed on a transitional work schedule.

On October 3, 2016, P&G notified Plaintiff that he was again partially disabled under the Plan, and he would resume receiving payments under the Plan as a partially disabled participant beginning September 23, 2016.   The letter advised Plaintiff that he had received disability benefits as a partially disabled participant for the periods of January 30, 2008 through May 2, 2008, and January 10, 2013 through February 4, 2013. Thus, 17 weeks of partial disability benefits had been exhausted, leaving Plaintiff with a total of 35 weeks of partial benefits remaining.

On December 13, 2016, a progress note from Dr. Merkel indicated that approximately one year after Plaintiff's hip replacement surgery, Plaintiff was "getting along very well."  ECF No. 18-8 at 312.  Dr. Merkel noted that Plaintiff was fully ambulatory without a cane or ambulatory aid, and Plaintiff reported he was back to full activities with no difficulty.

On March 27, 2017, Plaintiff appealed the October 3, 2016 letter finding partial disability to the Disability Committee and requested additional time to supplement the record.  Thereafter, Plaintiff submitted his formal appeal, arguing that the restrictions listed in the October 3, 2016 letter did not originate from his treating physician, but rather were designed by Dr. Karshner; that Dr. Karshner was not independent because he was paid by P&G to examine Plaintiff; that Dr. Karshner did not review 3,722 pages of relevant medical records; and that Dr. Karshner did not understand the distinction between Partial Disability and Total Disability under the Plan.

On April 5, 2017, Dr. Merkel completed an Assessment of the Individual's Work-Related Abilities and Limitations.  Dr. Merkel opined that Plaintiff was "unable to lift

due to balance and hip pain" and that he "[could] not carry weight due to [an] uneven gait." ECF No. 18-8 at 307. He marked that Plaintiff could push or pull no more than five pounds; reach for no more than 30 minutes; handle for no more than 30 minutes; finger for no more than 60 minutes; stoop for no more than 30 minutes; kneel for no more than 30 minutes; and crouch for no more than 30 minutes.

On April 12, 2017, P&G formally notified Plaintiff that his partial disability benefits would end of May 25, 2017, due to exhaustion of the 52-week lifetime maximum. On May 9, 2017, Plaintiff underwent an IME conducted by Robert Poetz, D.O. Dr. Poetz concluded that Plaintiff was unable to perform the job duties of a technician due to his right hip surgeries and resulting complications, as well as deep vein thrombosis, and that Plaintiff qualified for long-term disability benefits. Dr. Poetz recommended that Plaintiff avoid pushing and pulling; heavy lifting; strenuous activity; and prolonged sitting, standing, walking, stooping, bending, squatting, twisting, or climbing.

On June 21, 2017, Elliott Ames, M.D., an orthopedic surgeon, performed an independent medical review ("IMR") of Plaintiff's claim file. Dr. Ames reviewed Plaintiff's medical records, the IME report completed by Dr. Karshner, and the IME conducted by Dr. Poetz. Dr. Ames disagreed with some of the restrictions listed in Dr. Karshner's IME report in favor of restrictions recommended by Dr. Merkel. Specifically, Dr. Ames stated that he was "more inclined to agree with the attending physician who performed 15 of the 17 surgical procedures." ECF No. 18-8 at 401. Dr. Ames ultimately concluded that there was objective medical support in the record for total functional

impairment from May 9, 2013 through June 21, 2016, and partial impairment from June 21, 2016 to the present. Dr. Ames opined that Plaintiff was totally disabled because the medical records supported an inability to work in any capacity during this time frame due to his extreme physical restrictions. Dr. Ames took note of Dr. Merkel's progress note from December 2016 indicating that Plaintiff was fully ambulatory and back to full activities with no difficulty. Thus, although Dr. Ames did not have a copy of Dr. Merkel's June 21, 2016 progress note, which prompted P&G to request that Plaintiff undergo an IME, he concluded that the December 2016 note supported a finding that Plaintiff was only partially disabled, effective June 21, 2016.

On July 14, 2017, Dr. Ames provided an addendum to his IMR report after reviewing additional information provided by Plaintiff. Dr. Ames slightly revised his initial assessment, indicating that Plaintiff was unable to work in any capacity from June 10, 2013 (the date of Plaintiff's first hip surgery) to June 21, 2016, at which time Plaintiff's condition changed to partial impairment.

On July 26, 2017, the Disability Committee notified Plaintiff that the Reviewing Board's October 3, 2016 partial disability determination was proper and denied Plaintiff's claim for total disability benefits. The Disability Committee specifically cited Dr. Karshner's IME report, 3,722 pages of Plaintiff's medical records, Dr. Poetz's May 9, 2017 IME, and 139 pages of additional medical records from Dr. Merkel. The Disability Committee stated that based on the medical records, Plaintiff underwent a successful total hip arthroplasty on December 11, 2015, and, on June 21, 2016, Dr. Merkel documents that Plaintiff was "doing well" with no signs of infection. The Disability Committee

relied on Dr. Karshner's IME report, in which he indicated that Plaintiff was able to drive, get groceries, run errands, don socks, and walk up a total of 15 steps at a time. The Disability Committee also relied on Dr. Ames' IMR, which concluded that Plaintiff was unable to work in any capacity until June 21, 2016 and adopted Dr. Merkel's restrictions. Thus, the Disability Committee denied Plaintiff's appeal for total disability benefits.

On September 26, 2017, Mallory Mountz, M.D., completed an FCE on behalf of Plaintiff. Dr. Mountz opined in the Residual Functional Assessment Summary that

> [Plaintiff] does not demonstrate the ability to perform sustained work activities over an 8-[hour] day at this time. [Plaintiff] does not demonstrate the ability to perform SUSTAINED lower extremity activities even at the sedentary level. [Plaintiff] does not demonstrate the ability to walk for any sustained periods, carry or stand for more than 1-2 hours total over an 8-hour day. [Plaintiff] is unable to tolerate/maintain the positions of stoop, crouch or kneel, stair climbing, prolonged standing to perform handling right/left and prolonged standing to perform bimanual handling, at this time.

ECF No. 18-8 at 422. In the Functional Abilities Summary, Dr. Mountz assigned Plaintiff an overall strength category of "sedentary-light," and indicated that Plaintiff was able to walk frequently; stoop frequently; kneel occasionally; reach and handle constantly; sit constantly; stand frequently; carry 21-50 pounds occasionally; and pull 51-100 pounds occasionally.

On October 6, 2017, Plaintiff appealed the April 12, 2017 decision that Plaintiff's maximum lifetime total of 52 weeks of Partial Disability Benefits would exhaust and disability benefits would terminate on May 25, 2017. Plaintiff argued that his permanent restrictions and limitations prevented him from working in even the lowest strength categories. Plaintiff referenced Dr. Ames' IMR report, which indicated that Plaintiff

could not lift more than five pounds and could only sit on an occasional basis, and argued that "[t]here is no job at [P&G] or any other employer that exists that could accommodate these permanent restrictions and limitations." ECF No. 18-8 at 419. He also included the FCE completed by Dr. Mountz.

On October 26, 2017, Dr. Ames authored a second addendum to his June 21, 2017 IMR report after reviewing Dr. Mountz's FCE. Dr. Ames was asked to determine Plaintiff's inability to work for the time frame following May 25, 2017 (the date that Plaintiff's partial disability benefits expired). Dr. Ames opined that based on the FCE, Plaintiff was partially impaired from May 25, 2017 until September 25, 2017. In other words, the limitations he set forth in prior reports applied to this period. However, Dr. Ames concluded that Plaintiff would not be able to work in any capacity as of September 26, 2017 (the date of the FCE). Specifically,

> [Plaintiff] would be restricted from climbing ladders, climbing stairs, walking on rough or uneven ground, crouching, lifting from floor to waist, kneeling, reaching below the waist, standing greater than 2 hours total over an 8-hour day, walking on an occasional basis but not greater than 30 minutes at a time for a total of 2 hours during an 8-hour day provided that this was on a level, smooth surface.

ECF. No. 18-8 at 455.

On November 17, 2017, the Disability Committee notified Plaintiff that the partial disability exhaustion determination was proper and, accordingly, Plaintiff's appeal for total disability benefits was denied. The Disability Committee explained that it had performed a two-step review of Plaintiff's appeal. First, the Disability Committee reviewed the claim to ensure that the participant is not totally disabled. Second, if the

participant is not totally disabled, the Disability Committee determines whether the participants had received 52 weeks of disability benefits while partially disabled.

Here, the Disability Committee determined that Plaintiff was not totally disabled because "total disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home." ECF No. 18-8 at 459. In contrast, "a partially disabled participant is not necessarily prevented from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home." *Id.*

Based on the medical evidence in the record, the Disability Committee determined that Plaintiff was not totally disabled because

> The Functional Capacity Evaluation report, conducted on September 26, 2017, documents that while [Plaintiff] has an inability to work 8 hours a day, 5 days a week, he does retain the abilities of lifting, carrying, pushing, pulling, walking, stooping, kneeling, sitting, standing, and upper extremity function in excess of what is indicated in [Dr. Mountz's] Residual Functional Assessment Summary.

*Id.* at 460. The Disability Committee further opined that "an independent file review of [Plaintiff's] claim documentation by [Dr. Ames] . . . concludes that there was objective medical information to support a partial impairment as of May 25, 2017." *Id.*

Lastly, the Disability Committee outlined the periods of time during which Plaintiff was partially disabled, concluding that he had exhausted his 52 weeks of lifetime disability benefits as a partially disabled participant as of May 25, 2017. The Disability Committee noted that although Dr. Ames determined that Plaintiff was totally disabled as of September 26, 2017, Plaintiff was ineligible to receive those benefits because after

receiving 52 weeks of disability benefits as a partially disabled participant under the Plan, the Plan must deny further disability benefits to such participant. Thus, Plaintiff was ineligible for any disability benefits after May 25, 2017.

On January 20, 2018, Plaintiff filed this lawsuit in federal court challenging the Disability Committee's decision that he was not totally disabled, and thus he claims the denial was arbitrary, capricious, a breach of fiduciary duty, not based on substantial evidence, and was the product of a conflict of interest and procedural irregularities. Plaintiff also brings one count of breach of fiduciary duty, alleging that P&G failed to discharge its duty of handling Plaintiff's benefits claim in a careful, skillful, and diligent manner.

On November 21, 2018, Plaintiff filed a motion for summary judgment on the basis that P&G's decision to terminate benefits was not based on substantial evidence because it ignored evidence of Plaintiff's total disability. ECF No. 32. On December 17, 2018, P&G filed a cross motion for summary judgment, asserting that the Disability Committee's decision was reasonable and supported by substantial evidence, and seeking summary judgment on Plaintiff's breach of fiduciary duty claim.

## ARGUMENTS OF THE PARTIES

In his motion for summary judgment and opposition to Defendants' cross motion for summary judgment, Plaintiff argues that P&G's decision to transition Plaintiff from receiving total disability benefits to partial disability benefits was not based on substantial evidence in the record and ignored credible evidence of Plaintiff's total disability. Specifically, Plaintiff maintains that P&G solely relied upon Dr. Merkel's June 21, 2016

progress note in determining that Plaintiff was no longer totally disabled and thus ignored substantial medical evidence from Plaintiff's physicians indicating the opposite.

Plaintiff further argues P&G applied an inconsistent definition of "total disability." Specifically, Plaintiff maintains that P&G has routinely applied a less stringent definition of total disability to mean the inability to perform any job at the company or elsewhere, rather than the more restrictive requirement that the participant be hospitalized or restricted to the home. Plaintiff maintains that due to P&G's inconsistent application of the definition of total disability, he was not provided with adequate notice that his claim would be denied. Plaintiff also contends that P&G failed to explain the differing restrictions noted by the different physicians in the record. Lastly, Plaintiff argues that P&G had a conflict of interest when evaluating his claim, which resulted in the Disability Committee cherry-picking medical records to support its decision to deny benefits and selecting medical reviewers known to be inclined to make determinations that plan participants are not disabled. Plaintiff did not seek summary judgment on his claim of breach of fiduciary duty.

P&G contends that the decision to terminate total disability benefits was not an abuse of discretion because the review and analysis conducted by P&G conformed with the applicable ERISA standards. It argues that there exists sufficient objective medical evidence that Plaintiff was no longer totally disabled. Further, P&G contends that it properly and consistently applied the definition of totally disabled and partially disabled set forth in the Plan, and that if an individual is able to work in some capacity, he or she would not satisfy the Plan's definition of total disability. Lastly, P&G argues that

Plaintiff is unable to demonstrate any conflict of interest on the part of P&G, and that it is entitled to summary judgment on Plaintiff's breach of fiduciary duty claim because Plaintiff failed to present any evidence in support thereof.

## DISCUSSION

### Standard of Review

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Metro. Prop. & Cas. Ins. Co. v. Calvin*, 802 F.3d 933, 937 (8th Cir. 2015) (citation omitted). On a motion for summary judgment, facts and all reasonable inferences must be construed in favor of the nonmoving party; however, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted). "The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe v. County of St. Louis, Mo.*, 690 F.3d 1004, 1011 (8th Cir. 2012) (citations omitted). The movant is entitled to summary judgment when the nonmovant has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### ERISA Standard

"In general, a claim administrator's denial of benefits is subject to de novo review by the district court. Where the plan grants the administrator or fiduciary 'discretionary

14

authority' to determine eligibility for benefits, however, the standard of review is relaxed, and abuse of discretion becomes the appropriate benchmark." *Cooper v. Metro. Life Ins. Co.*, 862 F.3d 654, 660 (8th Cir. 2017). "To determine whether the benefit plan gives the administrator or fiduciary discretionary authority, courts must look for explicit discretion-granting language in the policy or in other plan documents." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003) (citations omitted). Here, the Plan at issue includes the requisite language triggering the Court's abuse of discretion standard, in that it grants the Disability Committee broad discretionary authority to review and decide claims. *See Cooper*, 862 F.3d at 660.

Because, under the Plan here, P&G served as the party responsible both for administering the plan (i.e., the plan administrator) and for paying claims under the plan (i.e., the plan sponsor), "this dual role creates a [financial] conflict of interest." *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 108 (2008); *accord Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314, 319–20 (8th Cir. 2018). When such a conflict of interest exists, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Glenn*, 554 U.S. at 108. "Where an insurer has a history of biased claims administration, the conflict may be given substantial weight, but where the insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight." *Id.*

"The weight afforded this factor necessarily depends on the facts of the case." *Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314, 320–21 (8th Cir. 2018). Here, there is no

evidence of a history of biased claims administration or that P&G's claims review process was tainted by bias, nor is there any evidence that the medical professionals who reviewed the claim for benefits were employed by the insurer, that their compensation was tied to their findings, or that P&G acted as little more than a rubberstamp for favorable medical opinions. *Cooper*, 862 F.3d at 661. In fact, P&G provided Plaintiff with ample opportunity to develop the record, and it even requested that its reviewing medical expert take into account records that are dated after Plaintiff's disability benefits had been exhausted. Thus, the Court only gives the conflict some weight. *Id.* ("when the record contains no evidence about [the plan administrator]'s claims administration history or its efforts to ensure that claims assessment is not affected by the conflict, [the court] only give[s] the conflict some weight") (internal citations and quotation marks omitted).

The Court must affirm the plan administrator's interpretation of the plan unless it is arbitrary and capricious. *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010). Under the abuse of discretion standard, the Court will uphold a claim administrator's decision so long as it is reasonable and supported by substantial evidence. *Hampton v. Reliance Standard Life Ins. Co.*, 769 F.3d 597, 600 (8th Cir. 2014). "A decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps.*, 812 F.3d 628, 634 (8th Cir. 2016) (citation omitted).

The court must not substitute its own weighing of the evidence for that of the decision-maker. *Gerhardt v. Liberty Life Assur. Co. of Boston*, 736 F.3d 777, 780 (8th

Cir. 2013).  A claim administrator abuses its discretion when it ignores evidence that is directly related to a disability plan's definition of disability.  *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 681 (8th Cir. 2005).

The Court will first examine whether P&G's application of a less stringent definition of "total disability" deprived Plaintiff of adequate notice of the reasons for the denial of his disability claim.  To determine reasonableness, courts apply the five-factor test in *Finley v. Special Agents Mutual Benefit Association, Inc.,* 957 F.2d 617 (8th Cir. 1992): (1) whether the administrator's language is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation.  *Id.* at 621.

Here, in its correspondence to Plaintiff, P&G consistently applied a definition of total disability as "the inability to perform any job at the company or elsewhere." Plaintiff maintains that P&G's interpretation conflicts with the Plan's definition of total disability, which requires "care in a hospital or restriction to the immediate confines of the home."  However, Plaintiff ignores the Plan's definition of partial disability. Specifically, partial disability means that the participant "can perform other roles at the same site or other jobs outside the Company."  Thus, P&G's applied definition of "the inability to perform any job at the company or elsewhere" is internally consistent with the definition of partial disability, as well as the goals of the Plan.  Moreover, P&G's less

stringent application favors Plaintiff, as it does not require Plaintiff to be hospitalized or confined to his home. Thus, P&G's less stringent definition of total disability was reasonable and consistently applied by P&G here. *See also Leirer v. Proctor & Gamble Disability Benefit Plan*, No. 4:15-cv-00122-AGF, 2017 WL 4339512 (E.D. Mo. Sept. 29, 2017) (applying the less stringent definition of total disability).

Next, the Court must determine whether P&G's decision is reasonable and supported by substantial evidence. The medical record reflects that between June 2013 and December 2015, Plaintiff underwent 17 surgical procedures related to his hip and various complications thereof. P&G determined that Plaintiff was eligible for total disability because "there was objective medical information to support an inability to work in any capacity on June 10, 2013 (the date of his arthroscopy)." ECF No. 18-1 at 473.

Then, P&G requested that Plaintiff undergo an IME based on a progress note authored by Dr. Merkel on June 21, 2016. That note revealed that six months after his most recent hip replacement surgery, Plaintiff "seem[ed] to be getting along well," and "did not have any significant pain." *Id.* at 145-146. Another progress note authored by Dr. Merkel in December 2016 reported that one year after hip replacement surgery, Plaintiff was "getting along very well," and Plaintiff reported that he was back to full activities. ECF No. 18-8 at 312.

Although Dr. Merkel later completed an assessment of Plaintiff's work-related abilities and limitations stating that Plaintiff was unable to lift due to balance and hip pain and that Plaintiff had an uneven gait, P&G reasonably relied on Dr. Ames' IMR report,

which concluded that Plaintiff was only partially disabled in light of his medical records. *Carrow v. Standard Ins. Co.*, 664 F.3d 1254, 1259 (8th Cir. 2012) ("[T]he Plan administrator may rely upon the reports of consulting, non-examining physicians over the reports of treating physicians . . . .").

The Court concludes that the Disability Committee's determination that Plaintiff was partially disabled as of June 21, 2016, is reasonable and supported by substantial evidence; namely, Plaintiff's medical records from Dr. Merkel's office; Dr. Karshner's IME, which concluded that Plaintiff could return to work with restrictions; the IMR conducted by Dr. Ames, which determined that Plaintiff could work in some capacity and incorporated many of the restrictions indicated by Dr. Merkel; and the FCE, which documents Plaintiff's ability to lift, carry, push, pull, walk, stoop, kneel, sit, and stand. *See Gerhardt v. Liberty Life Assur. Co. of Boston*, 736 F.3d 777, 780 (8th Cir. 2013) (holding that plan administrator did not abuse its discretion in terminating disability benefits where treating physician opined that plaintiff was disabled, but functional capacity exam and independent medical exam showed plaintiff could perform sedentary work. Although the Court notes that the FCE is somewhat internally inconsistent and Dr. Ames opined that Plaintiff was totally disabled as of the date of the FCE,[3] the Disability Committee reasonably relied on Plaintiff's medical records as a whole to conclude that he was not totally disabled, as that term is defined in the Plan. Furthermore, the date on

---

[3] The Court notes that Dr. Ames does not explain in any detail the basis for his opinion that Plaintiff transitioned from partially to totally disabled other than the FCE alone. In fact, his conclusion is undermined by the medical records from Plaintiff's treating physicians, which show steady progress in Plaintiff's physical condition related to his hip.

which Plaintiff was determined to be totally disabled by Dr. Ames is after the date that Plaintiff's benefits under the Plan were exhausted, and thus Dr. Ames' disability determination does not infect the Disability Committee's decision. And, although Plaintiff argues that there exists no job that could accommodate Dr. Ames' restrictions and limitations, this is speculative and unsupported by the record.

Lastly, P&G moves for summary judgment on Plaintiff's breach of fiduciary duty claim. Plaintiff did not seek summary judgment on this claim, nor did he respond to P&G's motion for summary judgment on this point.

Plaintiff alleges in his complaint that in terminating his benefits under the Plan, P&G "failed to adequately consider the facts and circumstances regarding his claims, failed to adequately investigate the facts supporting his claim, and relied on unfair, biased and incomplete reviews of [Plaintiff's] medical conditions in terminating benefits." ECF No. 1 at ¶ 38. For the reasons set forth above, the record reflects that P&G did consider all of the facts and circumstances regarding his claims and adequately investigated the facts. Moreover, there is no evidence that P&G's reviewing experts were simply a "rubber stamp" for decisions favorable to P&G. In fact, Dr. Ames adopted the physical limitations reported by Plaintiff's treating physician over those of Dr. Karshner in his determination that Plaintiff retained the ability work in some capacity and was thus partially disabled. Accordingly, the Court will grant summary judgment in favor of P&G on Plaintiff's breach of fiduciary duty claim.

## CONCLUSION

For the reasons set forth above, the Court finds that based on the record as a

whole, the substantial evidence supports the Disability Committee's determination to deny disability benefits under the Plan and that "a reasonable person could have reached a similar decision." *Hillery v. Metro. Life Ins. Co.*, 453 F.3d 1087, 1090 (8th Cir. 2006) (quoting *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1162 (8th Cir. 1998)). The Court further concludes that the evidence in the record supports granting summary judgment in favor of P&G on Plaintiff's breach of fiduciary duty claim.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment is **DENIED**. ECF No. 32.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment is **GRANTED**. ECF No. 39.

All claims against all parties having been resolved, a separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 20th day of June 2019.